**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 19-100 (BAH) |
| NIMROD SHALOM, | Chief Judge Beryl A. Howell |
| Defendant. | |

## MEMORANDUM OPINION

Defendant Nimrod Shalom, a dual Israeli-U.S. citizen charged with distributing child pornography, in violation of 18 U.S.C. § 2252(a)(2), and production of child pornography for importation into the United States, in violation of 18 U.S.C. § 2260(b), moves to dismiss the Indictment against him for violation of his Sixth Amendment right to a speedy trial.  Def.'s Mot. to Dismiss Indictment ("Def.'s Mot.") at 1, ECF No. 19.[1]  For the reasons set out below, defendant's motion is denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations Underlying Pending Charges

Since 2016, defendant resided in Israel, where he allegedly engaged in the unlawful conduct with which he is charged.  On August 1, 2016, defendant engaged in a conversation with an undercover law enforcement agent ("UC") based in the District of Columbia through a messaging application called KIK.  Statement of Facts Supp. Compl. ("SOF") at 2, ECF No. 1-1.[2]  Over the course of the conversation, defendant claimed he was sexually active with his four-year-old daughter and sent the UC three images constituting child pornography, claiming that the

---

[1]    Defendant asserts a speedy trial violation under the Sixth Amendment only and not under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*.

[2]    Defendant denies the allegations of unlawful conduct in the Complaint and Indictment and has entered not guilty pleas to Counts 1 and 2.  Min. Entry (Aug. 26, 2021).

young girl in each image was his daughter.  *Id.*  Due to concern about defendant's continued access to and abuse of a young child, law enforcement sent an emergency disclosure request to KIK for the subscriber information associated with defendant's username.  *Id.* at 3.  Among other information, KIK's response showed that the two IP addresses used by the account over the prior two days resolved to Internet Service Providers in Israel.  *Id.*  Law enforcement in the United States presented the collected investigative information, including the chat and images, to U.S. legal attaché personnel ("LEGAT") in Tel Aviv, who forwarded the information to the Israeli National Police.  *Id.*; FBI Case Opening Electronic Communication (Aug. 17, 2016) ("FBI Opening EC") at 2, ECF No. 30-2.  Further investigative efforts by the Israeli National Police revealed that defendant was the subscriber for one of the IP addresses used during the KIK communications with the UC.  SOF at 3.

On August 2, 2016, the Israeli National Police arrested defendant based on the information provided by LEGAT.  *Id.* at 4.  While defendant was detained, Israeli law enforcement determined that defendant did not in fact have a four-year-old daughter or access to any other children.  *Id.*  Their examination of defendant's cell phone, which defendant had in his possession at the time of the arrest, uncovered approximately twenty-three deleted images of child pornography, including the images sent to the UC.  Further forensic examination revealed that the KIK application was deleted from the phone close in time to when the Israeli police knocked on defendant's door.  *Id.*  During defendant's detention, defendant admitted to the Israeli police that he sent child pornography over KIK the previous day.  *Id.*; Israeli Email Correspondence at 1–2, ECF No. 30-3.[3]  Ultimately, Israeli law enforcement released defendant

---

[3]     Subsequent investigation by LEGAT and Israeli law enforcement also revealed that defendant sent child pornography images to another undercover agent in Maine on July 31, 2016, which was the subject of a separate investigation.  SOF at 4–5; FBI Opening EC at 2.

on about August 4, 2016.  SOF at 5; Israeli Email Correspondence at 1.  At that time, no charges against defendant had been filed in either country.

### B.    Filing of Criminal Complaint on August 19, 2016

Shortly after defendant's release, the government attempted to apprehend defendant on U.S. territory.  On about August 16, 2016, the government learned that defendant had booked a plane ticket to California for August 19, 2016.  SOF at 5; Gov't Opp'n Def.'s Mot. Dismiss ("Gov't Opp'n") at 3, ECF No. 20.  Around that same time, an Israeli investigator informed the U.S. case agent that defendant had inquired as to whether he could travel to the United States to visit his mother, and the investigator wanted to know whether defendant would be arrested if he traveled to the United States.  Gov't Opp'n at 3.  The case agent replied that Israeli law enforcement had the discretion to disclose the U.S. investigation to defendant.  *Id*.  Alerted to defendant's travel plans to the United States, the government promptly filed a sealed criminal complaint on August 19, 2016, seeking a warrant for defendant's arrest, which was issued the same day by this Court.  *See* Arrest Warrant (Aug. 19, 2016), ECF No. 9.  Defendant, however, did not board his August 19 flight.  Gov't Opp'n at 3.  Instead, for the next five years, he remained in Israel, living in the same city in which he was arrested, briefly detained, and released by Israeli authorities.  Def.'s Mot. at 2.

### C.    Israel's Decision Not To Charge Defendant in December 2018

After the failed attempt to arrest defendant through his voluntary return to the United States in August 2016, the government's investigation proceeded, albeit at a slower pace.  Later that year, the government sent the Israeli government a Mutual Legal Assistance Treaty ("MLAT") request to obtain the investigative materials gathered by Israeli law enforcement, including the extraction of defendant's phone, the forensic examiner's report concerning defendant's electronic devices, the investigative reports, and the record of defendant's interview

with the Israeli police.  Rough Tr. of Mot. Hr'g (June 3, 2022) ("June Hr'g Tr. (Rough)") at 14.

Six months later, on June 13, 2017, Israel responded to the request.  *Id.* at 15.  Throughout 2017,

the Israeli government and the U.S. government engaged in email correspondence discussing

whether U.S. authorities would seek to extradite defendant and, if so, when.  OIA

Communication Log (sealed) at 2–3, ECF No. 23-1.  In October 2017, Israel confirmed that the

U.S. government was aware that an individual extradited to the United States and subsequently

convicted must be returned to Israel to serve imprisonment.  *Id.* at 2.  In December 2017, Israel

informed the United States that it would not pursue charges against defendant.  Gov't's Opp'n at

3.  Throughout 2018, the government and Israel continued to engage in discussions about the

possibility of defendant's extradition, including potential legal issues that might arise.  OIA

Communication Log (sealed) at 1, 3–4.

> **D.      U.S. Indictment Return in March 2019 and Extradition Request in September 2019**

On March 14, 2019, the government obtained the pending two-count Indictment against

defendant, which indictment was placed under seal.  Indictment, ECF No. 2.  Thereafter, the

D.C. U.S. Attorney's Office ("DC-USAO") ramped up its efforts to extradite defendant from

Israel.  By March 23, 2019, within two weeks of the Indictment return, the DC-USAO submitted

a draft extradition request to the Department of Justice's Office of International Affairs ("OIA"),

the component responsible for handling extradition requests.  Gov't's Opp'n, Ex. 1, Decl. of

Jonathan Olson, OIA Associate Director ("Olson Decl.") ¶ 14, ECF No. 20.  Over the next four

months, both the DC-USAO and OIA worked to finalize the request and, on July 30, 2019, OIA

received the final extradition package.  *Id.* ¶¶ 14–15.  OIA completed its final review on August

2, 2019, and forwarded the extradition package to the Department of State, which completed its

review on September 6, 2019.  *Id.* ¶ 16.

OIA then submitted an electronic copy of the extradition request to Israel on September 9, 2019, OIA Communication Log at 1, and Israel received the official package on September 19, 2019, Olson Decl. ¶ 17.

Over the next two years, Israel twice requested additional information from OIA.  First, in December 2019, three months after receipt of the extradition request, the Israeli government requested from OIA additional information concerning uncharged conduct allegedly committed by defendant in jurisdictions outside of the District of Columbia.  *Id.* ¶ 18.  Six months later, on June 12, 2020, after discussing the requests with the DC-USAO, OIA responded to Israel's inquiries.  *Id.*  Nearly a year later, on April 19, 2021, Israel made a second request to OIA, seeking more information concerning defendant's criminal history, *id.* ¶ 19, but before the government responded, defendant voluntarily returned to the United States, *id.* ¶ 20, as discussed next.

### E. Defendant's Voluntary Return to the United States in July 2021 and Arrest

Defendant made his own plans to return voluntarily to the United States.  In 2021, defendant learned of a pending arrest warrant issued against him by a California state court, charging him with failing to register as a sex offender, due to his prior state-court conviction in 2015 for possession of child pornography.  Def.'s Mot. at 3; *see* Mot. to Recall Arrest Warrant at 1–2, ECF No. 30-4; Pretrial Services Report (Sept. 3, 2021) at 3–4, ECF No. 7.  In May 2021, defendant, with the assistance of counsel, filed a motion to recall the arrest warrant, so that he could contest the charges without being detained upon arrival in the United States.  Def.'s Mot. at 3; *see generally* Mot. to Recall Arrest Warrant.  The California court granted the motion and recalled the warrant, so defendant made plans to travel to California to resolve the pending California charges.  Def.'s Mot. at 3.

Upon his arrival in California on July 23, 2021, defendant was arrested on the warrant issued by this Court and subsequently had his initial appearance and arraignment in this District on August 26, 2021, at which proceeding he invoked his right to a speedy trial. *Id.*

**F. Instant Motion to Dismiss Indictment**

Following three separate continuances to which defendant consented, along with exclusions of time under the Speedy Trial Act, at a status conference on April 1, 2022, defendant objected to any additional exclusion of time. *Id.* at 6–7. On April 8, 2022, defendant filed the pending motion to dismiss the Indictment, asserting that the five-year delay between the filing of the Complaint and his initial appearance before this Court violated his constitutional right to a speedy trial. *Id.* at 4.

While briefing on defendant's pending motion to dismiss the Indictment was underway, defendant moved to compel the government "to produce copies of all correspondence and documents sent between the United States government and the government of Israel in relation to the possible extradition of [defendant]," Def.'s Mot. to Compel Discovery at 1, ECF No. 21, which motion prompted a hearing on May 3, 2022, Min. Entry (May 3, 2022). Following the hearing, the Court ordered the government to submit a log of each document and communication requested by defendant as relevant to his motion to dismiss that OIA refused to produce and to provide for each document and communication listed in such log (1) the basis for withholding and (2) an explanation for why a protective order covering the item's disclosure would be insufficient protection. Min. Order (May 3, 2022). In response, the government filed a motion for a protective order to govern its production of the communication log, which the Court granted. Min. Order (May 6, 2022). Following the government's submission of the communication log under seal and supplemental briefing by the parties for defendant's motion to compel, *see generally* Gov't's Opp'n to Def.'s Mot. to Compel Discovery, ECF No. 22; Def.'s

Reply Supp. Mot. Compel to Discovery, ECF No. 26, defendant's motion to compel was denied, Mem. & Order (May 12, 2022), ECF No. 29.

Briefing was then completed on the instant motion, for which the Court heard oral argument on June 3, 2022.  Defendant's motion to dismiss the Indictment for violation of defendant's Sixth Amendment right to a speedy trial is now ripe for resolution.

## II.   DISCUSSION

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  The Supreme Court has repeatedly held that "the Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution."  *Doggett v. United States*, 505 U.S. 647, 655 (1992).  Thus, to establish a violation of the Sixth Amendment right to a speedy and public trial, a defendant must show first that the Amendment's protections have been triggered by "arrest, indictment, or other official accusation."  *Id.*

Once the Sixth Amendment's protections have been activated by a qualifying event, courts then assess whether any delay in bringing the defendant to trial has exceeded constitutional bounds.  This assessment involves consideration and balancing of the following four factors set out by the Supreme Court in *Barker v. Wingo*: (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his or her right to a speedy trial, and (4) the prejudice suffered by the defendant from the delay.  407 U.S. 514, 530 (1972); *see also United States v. Tchibassa*, 452 F.3d 918, 922–23 (D.C. Cir. 2006).  As is typically the case when the court must engage in balancing multiple factors, "[n]one of the four factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial'; '[r]ather, they are related factors and must be considered together with such other circumstances

as may be relevant.'"  *Tchibasssa*, 452 F.3d at 923 (second alteration in the original) (quoting
*Barker*, 407 U.S. at 533).

###### A.      Qualifying Event

At the outset, the parties dispute what event triggered the speedy trial clock during this
years-long process before defendant was brought before this Court.  Defendant claims that the
speedy trial clock began to run upon the filing of the Complaint on August 19, 2016.  Def.'s Mot.
at 4; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply") at 1, ECF No. 30.  The government
disagrees, arguing that caselaw identifies only three events as qualifying to trigger the Sixth
Amendment right to a speedy trial: (1) the filing of an indictment, (2) the filing of an
information, or (3) the defendant's arrest.  Gov't's Opp'n at 5; Gov't's Surreply at 2, ECF No.
31.  As defendant aptly points out, however, neither the Supreme Court nor the D.C. Circuit has
squarely addressed whether the filing of a criminal complaint alone, without an associated arrest,
activates the Sixth Amendment's speedy trial protections.  Def.'s Reply at 5–6; *see also United
States v. Houmane*, 898 F. Supp. 2d 153, 168 (D.D.C. 2012) (assuming without deciding that
filing a criminal complaint triggers the Sixth Amendment speedy trial right "[b]ecause no
precedent definitively resolves the issue").

Here, the three- to five-year delay between the filing of the Complaint against defendant
and his indictment and then appearance in court, respectively, is sufficiently extensive that this
Court does not have the luxury of merely assuming without deciding that the Complaint
triggered the Sixth Amendment's speedy trial protections, but must confront the merits of this
issue.  The government rests its entire opposition on the premise that no speedy trial right
attached until the filing of the Indictment and does not even attempt to justify the almost three-
year delay between the filing of the Complaint and the filing of the Indictment.  Any assumption
or finding that the filing of the Complaint triggered the speedy trial clock could be dispositive

and therefore requires analysis.  Thus, this case squarely presents the question of whether the filing of a federal complaint charging a felony triggers the start of the speedy trial clock.  The answer to this question is that it does not.

Both parties rely on the Supreme Court's decision in *United States v. Marion*, 404 U.S. 307 (1971), in arguing their contrary positions for good reason: *Marion* and its progeny articulate "[t]he phase of the criminal process to which [the Sixth Amendment speedy trial] right extends," *United States v. Parrish*, 468 F.2d 1129, 1132 (D.C. Cir. 1972), but stop short of expressly answering the key question here of whether a complaint is a qualifying event.  In *Marion*, the Supreme Court held that, based on the plain text of the Sixth Amendment, its protection "is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." *Marion*, 404 U.S. at 313; *see also United States v. MacDonald*, 456 U.S. 1, 6 (1982) ("A literal reading of the Amendment suggests that this right attaches only when a formal criminal charge is instituted and a criminal prosecution begins.").  The Court went on to do a survey of the "longstanding legislative and judicial constructions of the speedy trial provisions in both national and state constitutions" in order to define more specifically when the right attaches. *Marion*, 404 U.S. at 313–20.  Ultimately, this legal survey led to the conclusion that "it is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Id.* at 320.  Put simply, the Supreme Court identified two types of events that trigger the Sixth Amendment's speedy trial protections: (1) the filing of an "indictment, information, or other formal charge" or (2) the public accusation occasioned by the arrest of a defendant who is then held to answer a criminal charge. *Id.* at 321.  The framework articulated

in *Marion* makes clear that the filing of a federal criminal complaint charging a felony is not sufficiently analogous to either of the two triggering events the Supreme Court identified.

In a federal prosecution, a felony complaint does not function as a formal charge in the same way as an indictment or information.  To be sure, all three documents are defined as a "written statement of the essential facts constituting the offense charged."  FED. R. CRIM P. 3 (describing the complaint); FED. R. CRIM. P. 7(c)(1) (describing the indictment or information). From there, however, the nature and function of the documents sharply and substantially diverge in proceeding with a felony prosecution.  The only document that can serve as the formal charging document upon which a felony prosecution is initiated and may proceed is an indictment, or, if a defendant waives prosecution by indictment, an information.  FED. R. CRIM. P. 7(a) and (b).  The complaint alone cannot initiate a felony prosecution nor serve as the formal charge to which a defendant must respond by entering a plea of guilty or not guilty.  The only function of a complaint for a felony prosecution is to "establish probable cause to believe that an offense has been committed and that the defendant committed it" so that a judge may issue an arrest warrant.  FED. R. CRIM. P. 4(a); *Gaither v. United States*, 413 F.2d 1061, 1076 (D.C. Cir. 1969) ("The principal function of a complaint is as a basis for an application for an arrest warrant." (internal quotation marks omitted)).  In fact, a criminal complaint may serve as the operative charging document only for a misdemeanor prosecution.  FED. R. CRIM. P. 58(b)(1) ("The trial of a misdemeanor may proceed on an indictment, information, or complaint.").

Lacking the power to begin a felony prosecution means a criminal complaint charging a felony lacks a necessary trait identified by the Supreme Court in *Marion* for activating the protections of the Sixth Amendment.  Accordingly, as have other courts to consider this question, this Court finds that the complaint simply does not fall within the class of formal

charging documents identified by the Supreme Court as a triggering event for speedy trial purposes.  *See, e.g.*, *Butler v. Mitchell*, 815 F.3d 87, 90 (1st Cir. 2016) (holding that the filing of a criminal complaint alone was not sufficient for purposes of starting the Sixth Amendment speedy trial clock because it does not function "as the charge necessary to commence the prosecutorial process in earnest"); *United States v. Richardson*, 780 F.3d 812, 814 (7th Cir. 2015) (holding that the filing of a criminal complaint did not trigger the speedy trial clock because it "cannot initiate a felony prosecution"); *Favors v. Eyman*, 466 F.2d 1325, 1327–28 (9th Cir. 1972) (holding that the defendant's Sixth Amendment right to a speedy trial did not attach when a criminal complaint was filed because it did not "serve the function of an indictment or information"); *United States v. Alvarado*, 440 F.3d 191, 199–200 (4th Cir. 2006) (holding that the filing of a federal criminal complaint "does not give rise to any Sixth Amendment right" because it "does not commence a formal prosecution"); *Pharm v. Hatcher*, 984 F.2d 783, 785 (7th Cir. 1993) ("The Supreme Court has adopted a narrow definition of official accusation, usually including only indictment and information.  Lower courts have limited the definition to events serving the same function as an indictment." (citations omitted)); 5 Wayne R. LaFave et al., Criminal Procedure § 18.1(c) (4th ed. 2021) ("A charging document short of an indictment, such as a complaint, will suffice [to trigger the speedy trial right] if it alone gives 'the court jurisdiction to proceed to trial'" (quoting *People v. Martinez*, 22 Cal. 4th 750, 764 (2000)); collecting cases).

The public filing of a criminal complaint indisputably serves as a public accusation that may be used as the basis to impose actual restraints similar to those imposed by a defendant being arrested and held to answer a criminal charge in an indictment.  As the Supreme Court in *Marion* explained, "[a]rrest is a public act that may seriously interfere with the defendant's

liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *Marion*, 404 U.S. at 320.  The main purpose of the Sixth Amendment's speedy trial provision is to safeguard defendants from these "major evils." *Id*.  By contrast, the filing of a criminal complaint under seal subjects a defendant to none of these hardships. *See Houmane*, 898 F. Supp. 2d at 168.  Furthermore, unlike an arrest, the mere filing of a criminal complaint does not require that a defendant immediately be brought before a judicial officer and held to answer for any charges. *Favors*, 466 F.2d at 1328 (noting that a criminal complaint "may, but will not necessarily, trigger an arrest" and subsequent preliminary hearing at which the defendant may be held to answer).  Thus, the filing of complaint, particularly under seal, does not fall within the second category of events the Supreme Court has identified as triggering the speedy trial clock—those that subject a defendant to actual restraints and require a defendant be made to answer for any charges.

The Supreme Court's concerns undergirding its holdings laying out the activation of the Sixth Amendment's speedy trial protections further support the conclusion that the filing of a sealed criminal complaint in this case did not trigger the speedy trial clock.  In *Marion*, the Supreme Court in no uncertain terms rejected the invitation to recognize a general speedy trial right that commenced prior to the filing of a formal charge, like an indictment, or the defendant actually being arrested and held to answer, because that "would have unfortunate consequences for the operation of the criminal justice system." *Marion*, 404 U.S. at 321 n.13.  Moreover, "[a]llowing inquiry into when the police could have arrested or when the prosecutor could have charged would raise difficult problems of proof." *Id*.

In *United States v. Lovasco*, the Supreme Court detailed further the consequences to befall the criminal justice system if prosecutions had to be commenced upon a finding of probable cause.  431 U.S. 783, 788–94 (1977).  The Court reiterated that "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.  To impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.'"  *Id.* at 791 (quoting *United States v. Ewell*, 383 U.S. 116, 120 (1966)).  On the one hand, such a requirement would injure defendants "because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried," with all the substantial concomitant costs such a formal accusation would entail.  *Id.*  On the other hand, "[f]rom the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited."  *Id.* at 791–92; *see also Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("There is no constitutional right to be arrested . . . . Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause . . . .").  Additionally, the Court recognized that "requiring the Government to make charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases."  *Lovasco*, 431 U.S. at 794.

In short, when the filing of a criminal complaint serves only to "establish probable cause to believe that an offense has been committed and that the defendant committed it" so that an

arrest warrant may issue, FED. R. CRIM. P. 4(a), all of the Supreme Court's concerns weigh heavily against recognizing a general speedy trial right to commence as of the time of that filing. The issuance of the arrest warrant due to the filing of a criminal complaint does not trigger a constitutional right for the defendant to be arrested and any investigation called to a halt so that a prosecution must commence, *Hoffa*, 385 U.S. at 310, nor is any delay, by itself, in executing the issued warrant unlawful, *United States v. Jones*, 377 F.3d 1313, 1314 (11th Cir. 2004) (per curiam) ("[A] suspect has no constitutional right to be arrested earlier than the police choose." (alteration in original) (quoting *United States v. Cravero*, 545 F.2d 406, 413 (5th Cir. 1976))). After the filing of a criminal complaint and issuance of an arrest warrant, the government maintains full control to continue investigating the defendant without having to bring the defendant before a judge until the time of the government's choosing.  If the speedy trial clock began ticking upon the filing of the criminal complaint, however, the procedural and practical problems the Supreme Court sought to avoid by refusing to extend the Sixth Amendment speedy trial right to a period prior to formal charging or arrest would all come into play.  Heeding the concerns set out by the Supreme Court in *Lovasco*, this Court is "most reluctant [and refuses] to adopt a rule which would have [the aforementioned] consequences absent a clear constitutional command to do so." *Lovasco*, 431 U.S. at 795.  Finding none in the Sixth Amendment, this Court concludes that the filing of the criminal complaint in this case did not trigger defendant's Sixth Amendment right to a speedy trial.

Defendant attempts to resist this conclusion by raising three separate issues, none of which are persuasive.  First, defendant points to the fact that he is charged with violating 18 U.S.C. §§ 2252(a)(2) and 2260(b), neither of which statutes are subject to a statute of limitations, *see* 18 U.S.C. § 3299, to argue that no reliance can be placed on the tolling of the statute of

limitations with the charging document, which is a factor courts have cited for finding that the
Sixth Amendment is triggered only by indictment or formal information.  Def.'s Reply at 4.
Contrary to defendant's assertion, the lack of a statute of limitations does not render "the Sixth
Amendment [as] the only protection a defendant has against unnecessary delay."  *Id*.  As the
Supreme Court clearly explained in *Marion*, "it is appropriate to note . . . that the statute of
limitations does not fully define the [defendant's] rights with respect to the events occurring
prior to indictment . . . . [T]he Due Process Clause of the Fifth Amendment would require
dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused
substantial prejudice to [a defendant's] rights to a fair trial and that the delay was an intentional
device to gain tactical advantage over the accused."  404 U.S. at 324.  Thus, the conclusion that
the filing of a criminal complaint is not sufficient to trigger the speedy trial clock does not leave
defendant without recourse to bring a claim that the pre-accusation delay in this case caused a
constitutional violation, even without the aid of a statute of limitations protecting defendant
against the bringing of overly stale charges.

Second, defendant points to a single out-of-circuit case holding that the filing of a
criminal complaint, when the defendant was not in custody at the time the complaint was filed,
triggered the right to a speedy trial.  The Ninth Circuit so held in *United States v. Terrack*,
finding that the filing of a complaint renders a suspect "an 'accused' within the meaning of
[*Marion*]."  515 F.2d 558, 559 (9th Cir. 1975).  This non-binding case is of little persuasive value
for two reasons.  First, the Ninth Circuit in *Terrack* did not fully engage with the Supreme
Court's clear holdings in *Marion*, which require that the criminal prosecution be commenced
before the speedy trial right may attach.  Second, the Ninth Circuit itself has an intra-circuit split
on this issue, further diminishing its persuasive value.  *Compare Northern v. United States*, 455

F.2d 427, 429 (9th Cir. 1972) (per curiam) (felony complaint triggers speedy trial protection), and *Terrack*, 515 F.2d at 559 (same), *with Favors*, 466 F.2d at 1327–28 (felony complaint does not trigger speedy trial right), and *Arnold v. McCarthy*, 566 F.2d 1377, 1382 (9th Cir. 1978) (same). As already discussed, the Supreme Court's caselaw and concerns surrounding the Sixth Amendment speedy trial right support the conclusion reached here that the filing of a felony complaint does not trigger the right's protection.

Finally, defendant attempts to leverage the fact that he was arrested in Israel as further support for why the Complaint served as "an 'official accusation' triggering the Sixth Amendment." Def.'s Reply at 8. The locus of defendant's initial arrest in August 2016 is inconsequential for a multitude of reasons, but two are fatal. First, as the government points out, no evidence shows that defendant's arrest in Israel was at the "behest" of the United States. Gov't's Opp'n at 3. Rather, the evidence shows that U.S. law enforcement, after discovering potentially serious and concerning behavior was occurring in Israel, based on defendant's messages that he was sexually abusing his minor daughter, quickly notified law enforcement in Israel so that they could take whatever steps they deemed appropriate. Just because U.S. law enforcement provided the Israeli law enforcement with information the latter decided to use to arrest and briefly detain defendant does not support the finding that the U.S. government directed, ordered, or requested the Israeli police to act on its behalf in taking steps to investigate defendant.

More importantly, although defendant was arrested, within two days he was released without any restraints, without ever being held to answer for any criminal charges, and several days before the filing of the criminal complaint in the United States. In fact, the Israeli government never filed charges against defendant. Defendant, freed without restraints and no

charges pending, was "in the same position as any other subject of a criminal investigation" and, consequently, without any of the protections offered by the Speedy Trial Clause. *United States v. Loud Hawk*, 474 U.S. 302, 311–12 (1986) (quoting *MacDonald*, 456 U.S. at 8–9). Accordingly, defendant's Israeli arrest has no impact whatsoever on when his right to a speedy trial attached.

For these reasons, defendant's speedy trial right attached only at the filing of the Indictment on March 14, 2019. Thus, the consideration of the *Barker* factors will address the twenty-eight-month delay between the filing of the Indictment and defendant's arrest.

### B.    Length of Delay

The duration of the delay, in addition to being one of the four *Barker* factors, also functions as a threshold requirement because the defendant must first establish that the length of the delay is at least "presumptively prejudicial." *Doggett*, 505 U.S. at 651–52 (citing *Barker*, 407 U.S. at 530–31); *Tchibassa*, 452 F.3d at 923. Here, the twenty-eight-month delay between the Indictment return and defendant's U.S. arrest is presumptively prejudicial. *See Doggett*, 505 U.S. at 652 n.1 (noting that "courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year" (citing 2 WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 18.2, at 405 (1984))); *United States v. Taplet*, 776 F.3d 875, 881 (D.C. Cir. 2015) (holding that "a delay of more than two years is 'presumptively prejudicial'" (citing *Doggett*, 505 U.S. at 651–52 & n.1)); *United States v. Lopesierra-Guitierrez*, 708 F.3d 193, 203 (D.C. Cir. 2013) (noting that the Supreme Court has suggested that a one-year delay is 'presumptively prejudicial'" (citing *Doggett*, 505 U.S. at 651–52 & n.1)).

With the threshold requirement satisfied, consideration of the length of the delay entails an inquiry into "the peculiar circumstances of the case" in order to ascertain how much delay is tolerable. *Barker*, 407 U.S. at 530–31; *see Lopesierra-Guitierrez*, 708 F.3d at 203. The

government contends that the circumstances surrounding this case, including the involvement of two countries, two MLAT requests for evidence located in a foreign country, an extradition request, and the context of evaluating the extradition request during the height of the COVID-19 pandemic, all serve to explain why the delay in this case cannot be considered "uncommonly long." Gov't's Opp'n at 8 (quoting *Doggett*, 505 U.S. at 651). Certainly, an international case involving a request for foreign evidence and an extradition request, especially one taking place during the height of the pandemic, would reasonably take longer to prosecute than "an ordinary street crime." *Barker*, 407 U.S. at 531. Thus, some delay in this case is both naturally expected and tolerable.

Yet, at least two of the circumstances cited by the government had little to no impact on the actual post-indictment delay. First, as confirmed during the June 3 hearing, the government obtained relevant information from the MLAT requests prior to indictment. June Hr'g Tr. (Rough) at 15. Put another way, the fact that MLAT requests were involved does not play any role as to whether the post-indictment delay in this case was reasonable. Second, the government's mere general reference to the pandemic is insufficient, absent any supporting explanation showing how this context actually affected capabilities of relevant personnel to process and evaluate the extradition request. On the contrary, as defendant persuasively argues, "the work of obtaining an extradition is precisely the type of work that would not be altered by the pandemic and [the] resulting . . . need to work remotely" because "[e]xtraditions are routine[ly] secured through remote work, through email communications and the remote exchange of documents." Def.'s Reply at 10. The government's failure to articulate any sort of prejudicial impact the pandemic had on relevant personnel, either in the United States or Israel, during the review of the extradition request renders this justification a moot consideration.

At the same time, the twenty-eight-month delay is less than other delays approved by the D.C. Circuit. *See Lopesierra-Gutierrez*, 708 F.3d at 203 (permitting delay of 3.5 years because "the delay, though significant, was neither so unjustified nor so prejudicial as to violate the Sixth Amendment"); *Tchibassa*, 452 F.3d at 927 (upholding eleven-year delay). Thus, while the twenty-eight-month delay is not presumptively violative of the Sixth Amendment, the length of the delay weighs slightly in defendant's favor.

### C.     Reason for Delay

"Closely related to length of delay is the reason the government assigns to justify the delay," although courts are instructed to assign different weights to different reasons. *Barker*, 407 U.S. at 531. Deliberate attempts to delay a trial in order to hamper the defense weigh heavily against the government. *Id.* On the other hand, more neutral reasons, such as negligence, "should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government." *Id.* Valid reasons serve to justify appropriate delay. *Id.* "[W]here a defendant is located abroad . . . the hallmark of government diligence is extradition." *United States v. Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C. 2009) (citing *Tchibassa*, 452 F.3d at 925); *United States v. Demirtas*, 204 F. Supp. 3d 158, 171–72 (D.D.C. 2016) (collecting cases); *see also Doggett*, 505 U.S. at 656 (noting that when the government pursues a defendant "with reasonable diligence from his indictment to his arrest, [generally] [a defendant's] speedy trial claim would fail").

The parties dispute whether the government pursued defendant's extradition with reasonable diligence from the time of indictment to arrest. "The government has an affirmative constitutional obligation to try the defendant in a timely manner and thus, the burden is on the prosecution to explain the cause of the pre-trial delay." *Fernandes*, 618 F. Supp. 2d at 68 (internal quotation marks omitted) (quoting *United States v. Graham*, 128 F.3d 373, 374 (6th Cir.

1997)); *see also Barker*, 407 U.S. at 527 ("A defendant has no duty to bring himself to trial; the State has that duty . . . ." (footnote omitted)).  In this regard, defendant points to several periods of delay during the twenty-eight months that he argues cannot be explained by the government and that he urges should be held against the government for acting negligently in pursuit of defendant's extradition.  The relevant periods are addressed in chronological order.

### 1. *Period from Indictment to Israel's Receipt of the Extradition Request*: *March 14, 2019 to September 2019*

Shortly after the Indictment return, the government began in earnest the process of working with OIA to finalize the extradition request for delivery to Israel.  All told, it took the government a total of six months to finalize and deliver the extradition package to Israel. Defendant contends that the six-month delay is unreasonable because the government had three years since the filing of the Complaint to start preparing the extradition request, so "[t]here is no reasonable explanation for the government's failure to have the extradition request ready for submission when the Indictment was returned."  Def.'s Reply at 13.  This contention falls flat. As previously explained, because the speedy trial clock did not start until the Indictment was filed, the government was under no obligation to begin preparing an extradition request for defendant when the decision whether to bring formal charges against him had not yet been finalized—perhaps awaiting a decision by Israeli authorities to proceed or decline prosecution where he resides.  To hold otherwise would fly in the face of the concerns the Supreme Court articulated in *Lovasco* and force the government to utilize scarce resources in cases that may never have a formal charge.  *See also Demirtas*, 204 F. Supp. 3d at 190–91 ("Although Demirtas suggests that the government could have prepared and submitted the extradition package with greater haste, reasonable diligence did not require it to submit the formal request in advance of the legal deadline.").

Additionally, the government offers a reasonable explanation for the four months that the DC-USAO and OIA used to finalize the extradition package. During that time period, based on OIA's recommendation, the DC-USAO was in communication with other jurisdictions in Maine and California discussing whether those jurisdictions would also be pursuing charges against defendant and whether all three jurisdictions should jointly submit an extradition request. June Hr'g Tr. (Rough) at 20–21. Although the final extradition request did not include requests related to alleged charges arising in those other jurisdictions, those discussions constitute a reasonable effort by the government to ensure its extradition request would be as strong and comprehensive as possible. *Id.* at 21.

Accordingly, the Court finds that the government acted with reasonable due diligence during the six-month period between the filing of the Indictment and Israel's receipt of the extradition request.

### 2. *Period from Israel's First Request for Additional Information to Government's Response: December 12, 2019 to June 12, 2020*

Defendant concedes that the three months between Israel's receipt of the extradition request and its first inquiry for additional information, from September 2019 to December 12, 2019, is attributable solely to Israel. Def.'s Reply at 14. Defendant argues, however, that the next six-month period from December 12, 2019 to June 12, 2020, between Israel's request for additional information concerning, at least in part, defendant's uncharged conduct occurring outside of the District of Columbia, and the government's response was solely due to government negligence. The government responds that, during that time period, the DC-USAO "worked assiduously [with OIA] to gather the additional information," discuss the issues, and then respond to Israel's inquiry. Gov't Opp'n at 9; *see also* Olson Decl. ¶ 18 ("Between December 2019 and June 2020, OIA and the USAO worked together to try to ascertain the

responses for information to Israel's questions, which included issues related to other jurisdictions."). No details about the substance of any communications between Israel and the United States have been shared, and the government strenuously objects to sharing additional information about the substance of those communications other than the barebones topic descriptions presented in the log of communications between OIA and Israel submitted under seal by the government in response to Court order. *See generally* OIA Communication Log (sealed); Mem. & Order (May 12, 2022) at 3 (noting that the OIA Communication Log contains "summaries of the contents of the requested communications and the date upon which the communications were made"); Gov't's Opp'n to Def.'s Mot. Compel at 5 (cautioning that "direct release of extradition-related communications to the defendant, even under the terms of a protective order, would severely and adversely affect the United States' extradition and mutual legal assistance relationship with Israel and other treaty partners" and that "Israel has informed OIA that it very strongly opposes the production of its internal communications with OIA, stating that the communications exchanged between the parties were written and sent under the assumption of confidentiality"). The government may have good reasons for strictly limiting information provided about extradition matters, but the burden nonetheless remains on the government to justify post-indictment delays.

Based on the current record, given the conferral with other jurisdictions that ostensibly occurred in preparing and submitting the extradition request during a time period found to be justified and reasonable, *see supra* Part II.C.1, an additional six-month period apparently for additional conferral on the same topic already plowed seems excessive. While prosecutors tasked with obtaining a positive outcome on an extradition request may not be expected to treat every follow-up question as having a hot deadline, a delay of six months to respond to a query

about the status of uncharged conduct against defendant is inexplicably long when that very issue was seemingly resolved before submission of the extradition request. *See, e.g.*, *United States v. Alexander*, 817 F.3d 1178, 1182–83 (9th Cir. 2016) (holding that the time it took the government to draft the extradition request should weigh against the government because "it [was] not clear that all of the 9.6 months should be ascribed to the complexities of [the] case—as opposed to the United States's negligence"). Accordingly, the Court finds that a significant portion of the government's six-month delay in responding to Israel's first request is not justified by reasonable diligence and, thus, at least four months of that period weighs against the government, albeit less heavily, due to negligence.[4]

### 3. *Period from Israel's Receipt of the Government's First Response to Israel's Second Inquiry*: *June 12, 2020 to April 19, 2021*

Defendant acknowledges that "[a]rguably, the government could do no more than wait for Israeli authorities after submitting the extradition request," Def.'s Reply at 14, but also contends the government's failure to engage in any follow-up on the extradition request during the ten months after its initial response, on June 12, 2020, until Israel's second request for information, on April 19, 2021, was not reasonable diligence, *id.* at 15. Indeed, neither the government's briefing nor the Olson Declaration reflects any effort during this period by the

---

[4]     In finding that the government has been less than diligent in addressing extradition-related issues, some courts have weighed the entire time period between the preparation and submission of the request or query response against the government rather than attempt to ascertain how much time might have been reasonably adequate to respond. *See, e.g.*, *Alexander*, 817 F.3d at 1182–83 (weighing the entire 9.6-month period against the government upon finding that the government failed to explain adequately the extent of the delay). Automatically assigning, however, an entire period as due to negligence without a consideration of the specific facts and circumstances would ignore the flexibility and fact-specific inquiry that the speedy trial right requires and would be inappropriate due to the serious consequence of the remedy involved—dismissal of the indictment. *See Vermont v. Brillon*, 556 U.S. 81, 89–90 (2009) ("The speedy-trial right is 'amorphous,' 'slippery,' and 'necessarily relative.' It is 'consistent with delays and depend[ent] upon circumstances." (alteration in original) (citation omitted) (quoting *Barker*, 407 U.S. at 522)). Based on the record in this case, the information requested by Israel was readily ascertainable, especially considering that the DC-USAO had already consulted with the other jurisdictions at issue prior to submitting the extradition request. Thus, the Court finds that a period of two months reasonably would have provided ample time for the government to respond to Israel's request and counts the remaining four months as delay due to government negligence.

government to pursue the extradition request with Israel.  *See, generally*, Olson Decl.; Gov't's

Opp'n.  Likewise, the OIA Communication Log submitted by the government reflects no

communications between Israel and the prosecutors or OIA from June 13, 2020 to April 18,

2021.  OIA Communication Log (sealed) at 2.

The government attempts to side-step this issue by arguing that the caselaw suggests "the

time required for the foreign country to process an extradition request is not held against the

requesting government."  Gov't's Opp'n at 10 & n.2.  The caselaw, however, more accurately

reflects that, even when the responsibility for moving forward rests with the extradition country,

some amount of follow up by the U.S. government is necessary to demonstrate reasonably

diligent pursuit.  *See Demirtas*, 204 F. Supp. 3d at 175, 180 (noting that the government's

"periodic contact" with the extradition country regarding the defendant's extradition status

served as "evidence that it was earnestly pursuing [the defendant]"); *United States v. Vasquez-

Uribe*, 426 F. App'x 131, 133–34, 138 (3d Cir. 2011) (declining to hold the government

responsible for the delay after a careful scrutiny of the government's attempts to apprehend the

defendant revealed that "the delay was principally a function 'of the different factions that were

involved'" and the government "assiduously collaborated with foreign and multinational law

enforcement agencies in its efforts to locate [and apprehend] [the defendant]"); *United States v.

Wangrow*, 924 F.2d 1434, 1437 (8th Cir. 1991) (holding no speedy trial violation where the

government requested deportation of the defendant to United States "as soon as [foreign charges

were] resolved" and "remained in periodic contact with [foreign] officials regarding [the

defendant]").  Radio silence by the government for ten straight months does not equate to

periodic contact by any stretch of the imagination, especially when compared to Israel's repeated

check-ins with the U.S. government concerning the status of the extradition request after it

informed the government in December 2017 that it would not pursue charges against defendant.
*See* OIA Communication Log at 1–4 (detailing status requests by Israel to OIA and the DC-
USAO in February 2018, March 2018, May 2018, July 2018, December 2018, September 2019,
and April 2020).

Unsurprisingly, the government attempted to clarify, belatedly, at the June 3 hearing, that
while no formal written queries were sent to Israeli authorities during June 2020 to April 2021,
per OIA's practice, informal conversations were occurring between OIA and Israel regarding the
status of the extradition request.  Counsel for the government articulated "[her] understanding
that there were informal conversations that happened in person between attorneys at OIA and
Israel."  June Hr'g Tr. (Rough) at 22.  Although she could not "tell the Court when these
conversations were," she did "know that those kinds of informal conversations were also
occurring" and that "OIA, in its determination, felt that the United States did not need to be more
forceful in submitting . . . written requests to Israel about this extradition request" based on "their
kind of experience in dealing with these matters diplomatically."  *Id.* at 22–23; *see also* Gov't's
Surreply at 7 (noting the government's reliance on "OIA's expertise and experience regarding
inter-country communications").

The problem with government counsel's representation is that neither the sworn
declaration submitted by OIA nor the OIA Communication Log reflects that any such
conversations took place during the time period at issue, despite the fact that the OIA
Communication Log does detail the existence of other informal conversations that took place
between Israel, OIA, and the DC-USAO concerning the extradition of defendant.  *See, e.g.*, OIA
Communication Log at 3 (summarizing telephone calls between Israel, OIA, and the DC-USAO
that took place during October and December 2017)  The government could have easily

remedied this glaring gap in the record by having OIA submit a more fulsome log of its communications with Israel, or, if OIA did not, for some reason, keep contemporaneous notes of its informal conversations with Israel concerning the extradition request, by providing a supplemental declaration from OIA summarizing previously unmentioned communications between OIA and Israel.  *See* Olson Decl. ¶ 5 (noting that "[t]he chronology set forth in this declaration does not constitute the entire chronology in this matter; it highlights those events in which OIA was involved and which are most relevant to responding to the defendant's motion"). Instead, the government's decision to provide the Court with the starkest of evidentiary records—with a weak representation about the "understanding" of the prosecutor now handling the matter—precludes finding that the government has satisfied its burden to explain why it is not at fault, at least in part, for the delay.

As the delay between the government's first response to Israel and Israel's follow-up query in April 2021 is, in part, attributable to government negligence and, in part, attributable to Israel, at least half of the ten-month delay weighs against the government.

### 4.  *Period from Israel's Second Inquiry to Defendant's Arrest: April 19, 2021 to July 23, 2021*

For the three months after Israel's request, on April 19, 2021, for additional criminal history information concerning the defendant, including specific facts related to defendant's prior conviction in California, the government offers no explanation as to why no response was made before defendant's voluntary return to the United States.  *See* Gov't's Opp'n at 9.  Accordingly, at least one of those three months will be weighed against the government as negligence in pursuit.

***

In sum, out of the twenty-eight-month delay occurring between Indictment return to arrest, twenty months, in total, are attributable to the government.  Not all of the delay attributable the government, however, was justified.  As this analysis shows, merely because an extradition request is pending does not automatically relieve the government of the obligation diligently to pursue a response from the foreign sovereign, including by promptly responding to queries about the request.  Here, based on the thin record made available to the Court, the government did not perform diligently for ten months of the overall delay.  Although this unjustifiable delay falls short of the one-year-long delay seen as presumptively prejudicial, *Doggett*, 505 U.S. at 652 n.1, it still must be weighed against the government, *see Barker*, 407 U.S. at 531 ("A more neutral reason such as negligence . . . should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.").  Consequently, while the majority of the delay from indictment to arrest is justified, this factor weighs slightly against the government.

### D.    Defendant's Assertion of the Speedy Trial Right

The third factor requires courts to consider whether and how a defendant asserts his right to a speedy trial.  "[A] defendant cannot be blamed for a failure to assert his right to a speedy trial until he 'know[s] of the charges' against him." *Demirtas*, 204 F. Supp. 3d at 191–92 (quoting *Doggett*, 505 U.S. at 653–54).  Here, defendant insists that he was not aware of the sealed charges against him until his arrest in July 2021.  Def.'s Mot. at 6; Def.'s Reply at 16.[5]  At

---

[5]    While not disputing that defendant was unaware of the specific U.S. charges before his arrest, the government suggests he might have been aware of this possibility, citing his inquiry to an Israeli investigator about whether he was allowed to travel to the United States to visit his mother, the U.S. case agent's grant of discretion to the Israeli investigator to disclose to defendant the existence of a U.S. investigation, and defendant's subsequent failure, in August 2016, to board his booked flight to the United States.  Gov't Opp'n at 11.  All three incidents are highly indicative of his awareness of, at least, the potential risk of a prosecution against him in the United States.  Any such concern he may have had about the risk of prosecution is nonetheless somewhat speculative and, in any event, not the same as full awareness of the specific charges. *Cf. Tchibassa*, 452 F.3d at 926 & n.7 (concluding that

the first opportunity, he promptly asserted his right to a speedy trial at his initial appearance in

the District of Columbia.  Def.'s Reply at 16; *see* Min. Entry (Aug. 26, 2021).  Although

defendant then proceeded to consent to several exclusions of time under the Speedy Trial Act,

each were made on the advice of counsel for the purpose of allowing the parties to complete and

review discovery and thus do not count against him.  Def.'s Reply at 16–17; *see Demirtas*, 204

F. Supp. 3d at 192–93.  Nonetheless, the delay at issue falls pre-arrest and before defendant was

able to assert his speedy trial rights, so this factor weighs only slightly in his favor.  *See*

*Homaune*, 898 F. Supp. 2d at 170.

E.   **Prejudice**

The final, and in this case the most critical, factor is prejudice.  The Supreme Court in

*Barker* identified three kinds of prejudice against which the right to a speedy trial was designed

to guard: (1) "oppressive pretrial incarceration"; (2) "anxiety and concern of the accused"; and

(3) "the possibility that the defense will be impaired."  407 U.S. at 532.  The first two types of

prejudice are clearly inapplicable to this case as defendant was neither imprisoned nor aware of

the specific charges during the period at issue.  *Doggett*, 505 U.S. at 654.  Thus, the only type of

prejudice due to delay that defendant could claim is a somehow impaired defense arising from

dimmed memories or destruction or compromise of exculpatory evidence.  *Id.*

Here, defendant does not allege he suffered any particularized prejudice due to the delay,

Def.'s Mot. at 7, and fails to specify how the delay "weakened his ability to raise specific

defenses, elicit specific testimony, or produce specific items of evidence," *Doggett*, 505 U.S. at

655; *see* Def.'s Reply at 17.  Instead, he argues that no actual prejudice is required because all

the other *Barker* factors weigh heavily in his favor.  Def.'s Reply at 17–18.  Defendant's failure

_____

the third *Barker* factor weighed against a defendant when "he was aware that charges were pending against him,"
even if the defendant "may not have known that a formal indictment had issued—or even that one was necessary").

28

to point to any actual prejudice, standing alone, dooms his request for relief and rests on a misunderstanding of the Supreme Court's explanation in *Doggett* of the roles presumptive and actual prejudice play in the disposition of speedy trial claims.

The circumstances surrounding the Supreme Court's prejudice analysis in *Doggett* match up almost exactly with this case, except for two significant differences.  In *Doggett*, the Supreme Court found that an 8.5-year lag between the defendant's indictment and arrest clearly sufficed to trigger the speedy trial inquiry.  *Doggett*, 505 U.S. at 652.  Six of those 8.5 years were attributable to government negligence, and because the defendant lacked awareness of the charges against him, his invocation of his speedy trial right only after his arrest did not weigh against him.  *Id.* at 652–54.  In short, as in this case, the first three *Barker* factors in *Doggett* did not weigh in the government's favor, so whether the defendant failed to raise a successful speedy trial claim turned on the prejudice analysis.

Similarly to this case, to show prejudice, the defendant in *Doggett* could rest only on the claim that the delay somehow impaired his defense, requiring analysis of the role actual versus presumptive prejudice should play in the disposition of his claim.  *Id.* at 654–56.  Although the defendant "failed to make any affirmative showing that the delay" impaired his defense, the Court explained that "consideration of prejudice is not limited to the specifically demonstrable" and, further, that "affirmative proof of particularized prejudice is not essential to every speedy trial claim."  *Id.* at 655.  When the government pursues a defendant with reasonable diligence from indictment to arrest, the defendant's speedy trial claim generally will fail "so long as [the defendant] could not show specific prejudice to his defense."  *Id.* at 656.  If the government's delay, however, is done in bad faith, relief is "virtually automatic."  *Id.* at 657.  Where the government's negligence causes the delay, "[w]hile not compelling relief in every case . . .

neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *Id.* Instead, the court's "tolerance of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial." *Id.* (citation omitted) ("[S]uch is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows."). Thus, "to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." *Id.* In *Doggett*, the Court found that because the delay attributable to the government's negligence was "six times as long as that generally sufficient to trigger judicial review" and "the presumption of prejudice, albeit unspecified, [was] neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant [was] entitled to relief." *Id.* at 658 (footnotes omitted) (citations omitted).

Unlike the government in *Doggett*, this case does not present either of the two factors the Supreme Court considered in holding that the government's delay violated the defendant's speedy trial right despite a lack of particularized prejudice attributable to the delay. First, although the government's pursuit of defendant here appeared, at times, to be so sluggish as to amount to negligence, the record does not reflect an "egregious persistence in failing to prosecute" defendant. *Id.* at 657. The government diligently submitted an extradition request to Israel for defendant's apprehension and responded, albeit sluggishly, to Israel's initial request for additional information. Its subsequent dilatory behavior, although not the gold standard, does not rise to the level of "inexcusable oversights." *Id.* Moreover, unlike in *Doggett*, here "[t]he portion of the delay attributable to the Government's negligence"—ten months—does not "exceed[] the [one-year] threshold needed to state a speedy-trial claim," *id.* at 657–58, and courts

have found that similar delays did not excuse a defendant from needing to demonstrate actual

prejudice in order to prevail, *see United States v. Gregory*, 322 F.3d 1157, 1162–63 (9th Cir.

2003) (holding that a 22-month delay attributable to government negligence "is not long enough

to excuse [the defendant] from demonstrating actual prejudice to prevail on his claim"); *United

States v. Beamon*, 992 F.2d 1009, 1013–14 (9th Cir. 1993) (17-month and 20-month delays were

insufficient "to relieve the defendant of the burden of coming forward with any showing of

actual prejudice"); *United States v. Clark*, 83 F.3d 1350, 1353–54 (11th Cir. 1996) (same for a

17-month delay); *Alexander*, 817 F.3d at 1183 (same for 9.6 months).

Second, and notably, this is the rare case where the government has persuasively rebutted

any presumed prejudice.  The Court agrees with the government that "it is hard to imagine what .

. . impairment [to defendant's defense] could possibly look like" given the nature of the case and

the evidence at issue.  Gov't's Opp'n at 12.  The charges in the Indictment require the

government to prove that on or about August 1, 2016, defendant, while in Israel, knowingly

distributed images of a minor engaging in sexually explicit conduct with the intent to import the

images into the United States.  Indictment at 1–2.  As the government notes, defendant admitted

in a recorded interview with Israeli investigators to sending the child pornography images, his

communications with the UC are memorialized, and the extractions from his cell phone, which

contain the images at issue, are in the custody of the United States.  Gov't's Opp'n at 12.  The

Israeli police also reviewed defendant's email accounts, social media, laptop, and personal tablet

and confirmed that none of those locations contained child pornography or related activity.

Israeli Email Correspondence at 1–2.  The fact that defendant is unable to name any witnesses

that might be necessary to his defense whose memories are now dim or point to any exculpatory

evidence that might have been lost is not surprising.  There are none.  Fortunately for the

government, the evidence establishing where defendant was, what he did, and how he did it on the dates charged is known and preserved, not lost to the ravages of time due to the delay. *See United States v. Rees*, 957 F.3d 761, 770 (7th Cir. 2020) (noting that digital evidence does not rapidly dissipate or degrade and can be retained almost indefinitely; collecting cases).

In sum, because (1) the nature of this case, including the necessity of an extradition request, affords the government some leeway in the delay of its prosecution of defendant, (2) the government sought defendant's extradition with some diligence, (3) defendant has failed to show any specific prejudice due to the delay, and (4) the government has successfully rebutted any presumed prejudice, on balance, the Court does not find that defendant has suffered a violation of his Sixth Amendment right to a speedy trial.

The government should not, however, take this outcome as endorsement of its conduct in pursuing defendant's extradition or in supplying the Court with the necessary evidence to satisfy its burden to explain any pretrial delay. As the Ninth Circuit has previously admonished, "U.S. Attorney's offices would do well to adopt systems of controls that would track the status of extradition requests so as to ensure the timely submission of extradition materials to the Justice Department and foreign governments." *Alexander*, 817 F.3d at 1183. The importance of the government's burden to explain any delays also should provide incentive to document thoroughly the efforts made to pursue a defendant's extradition, including reasonable efforts taken to confirm that foreign governments have not let the extradition request fall to the wayside. Had the government employed either of these reasonable practices, the resulting amount of delay likely would have engendered much less concern, especially in a normal case where the possibility of prejudice due to delay is not so easily disproven.

## III.   CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss the Indictment, ECF No. 19, is

denied.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: June 30, 2022

_____

BERYL A. HOWELL
Chief Judge